NO. 12-03-00059-CV



IN THE COURT OF APPEALS



TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS



§
 APPEAL FROM THE 


THE STATE OF TEXAS

FOR THE BEST INTEREST AND
§
 COUNTY COURT AT LAW OF

PROTECTION OF C.W.


§
 CHEROKEE COUNTY, TEXAS






MEMORANDUM OPINION


 Appellant C.W. appeals from an order of commitment for temporary inpatient mental health

services. After a hearing without a jury, the trial court ordered C.W. committed to Rusk State
Hospital for a period not to exceed ninety days. In six issues, C.W. asserts the evidence is legally
and factually insufficient to support the order, his constitutional rights to due process and equal
protection have been violated, and he was denied effective assistance of counsel. We affirm.


Background 

 On January 24, 2003, an application for court-ordered temporary mental health services was
filed requesting the court commit C.W. to Rusk State Hospital for a period not to exceed ninety days. 
The application was supported by a certificate of medical examination for mental illness, prepared
by a physician, Dr. S. Siddiqui, who had examined C.W. the day before. Dr. Siddiqui diagnosed
C.W. as suffering from Bipolar I disorder, most recent episode with mania, severe, and recurrent
with psychosis. The doctor indicated that C.W. is mentally ill and likely to cause serious harm to
himself and others. He based this opinion on C.W.'s statements that he had been preaching to his
father and he thinks the world is coming to an end because the Holy Spirit told him so. Also, he was
hyper-talkative and hyper-religious and experienced audio and visual hallucinations. The doctor also
indicated that, on January 21, 2003, C.W. started preaching to his family, refused his medication,
and wanted to kill Ted Turner because C.W. believes he is the anti-christ. Dr. Siddiqui determined
that C.W. presents a substantial risk of serious harm to himself or others if not immediately
restrained. He based this opinion on C.W.'s behavior and on evidence of severe emotional distress
and deterioration in his mental condition to the extent that he cannot remain at liberty. He relied on
the specific behaviors described above.

 On January 27, 2003, C.W. was examined by Dr. Charles Plyler who then also prepared a
certificate of medical examination for mental illness. Dr. Plyler also diagnosed C.W. as suffering
from Bipolar disorder type I, most recent episode manic. He found that C.W. is mentally ill and is
likely to cause serious harm to himself and others. On January 27, 2003, C.W. said that he had been
designated by the Holy Spirit to save others. C.W. hears the Holy Spirit and thinks Ted Turner is
the anti-christ. Dr. Plyler also determined that C.W. presents a substantial risk of serious harm to
himself or others if not immediately restrained, an opinion he based on C.W.'s behavior and on
evidence of severe emotional distress and deterioration in C.W.'s mental condition to the extent he
cannot remain at liberty. Dr. Plyler based this opinion on the statement by C.W. that he feels
personally appointed by God to save souls and his belief that Ted Turner is the anti-christ.

 Dr. Harry Thompson testified at the hearing. He explained that he is not C.W.'s treating
physician and did not complete a physician's certificate. He interviewed C.W just prior to the
hearing. He reviewed the certificate completed by Dr. Siddiqui and concurs with his diagnosis. He
stated that C.W. suffers from Bipolar I disorder, most recent episode manic, severe, recurrent, with
psychosis. The doctor believes C.W. is likely to cause serious harm to himself and to others. Dr.
Thompson stated that, even though Dr. Siddiqui did not, he would find C.W. is suffering severe and
abnormal mental, emotional or physical distress, is experiencing substantial mental or physical
deterioration of his ability to function independently, and is unable to make a rational and informed
decision as to whether or not to submit to treatment. 

 Dr. Thompson explained that C.W. can cause harm to himself because he refuses to take his
medications and he hitchhikes across the country. Also, C.W. has tried several times to kill himself. 
C.W.'s father has said he and the rest of the family are afraid of C.W. and they consider him to be
a threat. They are afraid he will kill them or himself. C.W. has been seriously mentally ill for at
least the last seven years. Symptoms he has displayed include manic hyperactivity, irresponsibility,
poor judgment, delusional thought and behavior based on those delusions. He demonstrates a pattern
of being hyper-religious and is very intrusive in his approach when he preaches. Considering his
mental history, his behavior, and his symptoms, C.W. exhibits a continuing pattern of behavior that
tends to confirm the likelihood of harm to himself or others. The doctor's opinion is based on a
review of the present illness, as shown in the psychological evaluation, and on input from the social
workers. Dr. Thompson stated that Rusk State Hospital is the least restrictive option available for
C.W. at this time.

 On cross-examination, Dr. Thompson explained that he had reviewed the psychological
evaluation, progress notes, and diagnostic sheet prior to interviewing C.W. The doctor did not
discuss with C.W. his reasons for refusing his medications. C.W. told the doctor he does not need
medication. The doctor explained that there is an inherent danger in his lack of organization and his
behavior. C.W. puts himself in danger by roaming around aimlessly, with no provisions and little
purpose. Placing himself at risk is an example of his poor judgment. Dr. Thompson explained that
the content of C.W.'s religious beliefs is delusional. For example, he thinks Ted Turner is the anti-christ and has personally threatened him. Accordingly, even though the anti-christ is a religious
concept, C.W. is not preaching religion. What C.W. says in his preaching is not evangelical in
nature. It is a display of delusional belief which he is calling religion. 

 Dr. Thompson reiterated that C.W.'s father says the family is terrified of him and do not want
him in their home. Dr. Thompson found nothing in C.W.'s chart to indicate he has made any overt
acts to harm himself or anyone else while at the hospital. His chart indicates that C.W. has taken his
medication by consent while at the hospital. This indicates he has the capacity to make a rational
and informed decision regarding his treatment. He can dress and feed himself without assistance and
take care of his personal hygiene without assistance. He can initiate conversation and respond to
questions. C.W.'s history indicates that he is a dangerous individual although since this admission,
he has not displayed dangerous or aggressive behavior. Dr. Thompson does not believe C.W. would
be able to survive safely in freedom due to his pattern of fleeing and failure to accept structured help.

 On redirect, Dr. Thompson explained that being hyper-talkative and having audio and visual
hallucinations are signs of C.W.'s disorder. C.W. has a history of refusing to take medication and
stopped taking his medication after discharge. However, he is taking medication while in the
hospital. If he were to discontinue his medication now, his Bipolar I disorder, manic phase, with
psychotic symptoms, would re-emerge and worsen. C.W. has heard voices and receives hidden
messages. The doctor explained that "the mania is characterized by hypertalkative, hyperactivity,
insomnia, and labile mood, markedly rapid change in behavior." The mood change is associated
with a behavioral change and that is often associated with poor judgment and impulsivity, which has
to do with behavior that is self-destructive and self-defeating. It is characteristic of C.W.'s illness
for him to return to mental illness after discontinuing his medication. His mental illness is likely to
lead to serious harm to himself and his family. Considering C.W.'s history of mental illness, history
of discontinuing medications, and the resulting recurring mental illness, and his current mental
symptoms, this continuing pattern of behavior tends to confirm the likelihood of causing serious
harm to himself.

 On re-cross, Dr. Thompson admitted that C.W. has not interrupted the court proceedings or
attempted to step away from his chair. C.W. sat and listened to everything. 

 C.W. took the witness stand in his own behalf. He said he does not want to stay in the
hospital, but if he has to, "that's fine." He would prefer to leave. When asked where he would go,
he explained that he would hitchhike and preach the word of God. He said he does not wish to hurt
himself or anyone else. He is given donations and offerings for his preaching to provide him with
food, clothing, and shelter.

 On cross-examination, he stated that he does not acknowledge that he needs to take
medications because he possesses the Holy Spirit. He explained that, while he once had a mental
illness, it was cured when he went to church, was saved, and born again. When asked if he had ever
threatened to kill or harm anyone, he first said no, then explained he had threatened to kill someone
out of anger. He stated: 


 God says there is a time to kill. The Lord gave me a prophecy. I had a child in high
school, and I can't find him. It's called chance or doubt. It means it could be true. 
I would like to find out, and I made an irrational statement, out of anger, if that
person took my kid, I would kill them but, you know, obviously out of anger. I
have turned that all over to my attorneys, and now I don't wish to kill. I mean, I
could think like that, if somebody really took my kid. By faith, I could pray Lord
to take this man's life. There is a time to kill.


In response to a question inquiring about his relationship with Ted Turner, C.W. explained:

 God says in the end - the end will not come unless there is a falling away and the
son of perdition is revealed. I learned through a preacher, and the Lord revealed it
to me, and I looked it up on the internet. There are three things written about him. 
He blasphemes the holy spirit, and that's the only proof I need to know that that
man is the anti-christ, and the day of the Lord is at hand. That's the faith I have and
the faith I keep.


He further explained that if he were allowed out of the hospital, he would go to a shelter to get off
the streets and he would get a job or preach.

 The trial court found that C.W. is mentally ill and is likely to cause serious harm to himself
and others. The trial court entered an order reflecting these findings and ordering C.W. committed
to Rusk State Hospital for inpatient care for a period not to exceed ninety days.


Sufficiency of the Evidence

 In his first issue, C.W. asserts the evidence is neither legally nor factually sufficient to
support the order of commitment. He complains that Dr. Thompson's only interview with C.W. was
brief and he performed only a cursory review of C.W.'s medical history. Asserting that the doctor
relied on the possibility that C.W. would not take his medication if released from the hospital as
evidence that C.W. is likely to harm himself, he argues that bare psychiatric opinion of a potential
harm is insufficient to support a commitment. Further, refusal to take medication is not an overt act
or a continuing pattern of behavior. C.W. also contends that a lifestyle that includes hitchhiking
cross country, or any psychotic behavior alone, cannot justify his involuntary commitment. Evidence
that C.W. may be mentally ill does not satisfy the statutory standard. Additionally, C.W. travels and
preaches to exercise his religious beliefs. He asserts that he is entitled to share those beliefs freely
with the public as long as he does so peaceably. His hitchhiking to share the word of God should
not be considered an overt act or continuing pattern of behavior tending to confirm that he is likely
to cause harm to himself or anyone else. 

 C.W. contends that, because the record provides no verification that he attempted to kill
himself, this evidence should not be considered as evidence of a recent overt act or continuing
pattern of behavior tending to confirm that C.W. is likely to cause serious harm to himself or others. 
Further, Dr. Thompson's testimony that C.W.'s family is afraid of him and afraid he might harm the
family is no more than bare psychiatric expert opinion of a potential danger and it is insufficient to
support a commitment. Therefore, he argues, the State failed to show a recent overt act or a
continuing pattern of behavior tending to confirm the likelihood of serious harm to C.W. or others. 
Thus, he argues, the State failed to meet its evidentiary burden under the statute. 

 In a legal sufficiency review where the burden of proof is clear and convincing evidence, the
reviewing court must consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
finding was true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). The reviewing court must assume
that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do
so. Id. A court should disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible. Id. 

 In addressing a factual sufficiency of the evidence challenge, this court must give due
consideration to evidence that the factfinder could reasonably have found to be clear and convincing. 
In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). We must determine whether the evidence is such that
a factfinder could reasonably form a firm belief or conviction about the truth of the State's
allegations. Id. "If, in light of the entire record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient." In re J.F.C.,
96 S.W.3d at 267.

 The trial judge may order a proposed patient to receive court-ordered temporary inpatient
mental health services if the judge or jury finds, from clear and convincing evidence, that the
proposed patient is mentally ill and, as a result of the mental illness he is likely to cause serious harm
to himself, is likely to cause serious harm to others, or is (i) suffering severe and abnormal mental,
emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of his 
ability to function independently, which is exhibited by his inability, except for reasons of indigence,
to provide for his basic needs, including food, clothing, health, or safety, and (iii) unable to make
a rational and informed decision as to whether or not to submit to treatment. Tex. Health &
Safety Code Ann. § 574.034(a) (Vernon 2003). To be clear and convincing under this statute, the
evidence must include expert testimony and, unless waived, evidence of a recent overt act or a
continuing pattern of behavior that tends to confirm either the likelihood of serious harm to the
proposed patient or others, or the proposed patient's distress and the deterioration of his ability to
function. Tex. Health & Safety Code Ann. § 574.034(d) (Vernon 2003). 

 The State provided expert testimony explaining that C.W. is mentally ill and describing his
pattern of behavior prior to admittance to the hospital. According to Dr. Siddiqui's certificate of
medical examination for mental illness, C.W. engaged in preaching, refused his medication, and
wanted to kill a public figure because C.W. thinks that man is the anti-christ. Dr. Thompson
explained in more detail that C.W. has a history of refusing to take his medication when not
hospitalized and has made several suicide attempts. He has exhibited a pattern of fleeing from his
home and hitchhiking aimlessly across the country without provisions intrusively preaching his
version of the gospel to strangers. Dr. Thompson explained that C.W. places himself at risk through
this behavior. The expert testimony of a continuing pattern of behavior tends to confirm the
likelihood of serious harm to others and to C.W. See In re R.M., 90 S.W.3d 909, 911-12 (Tex. App.
- San Antonio 2002, no pet.). 

 Considering all the evidence in the light most favorable to the findings, we conclude a
reasonable trier of fact could have formed a firm belief or conviction that these findings were true. 
See In re J.F.C., 96 S.W.3d at 266. This evidence satisfies the statutory requirement for clear and
convincing evidence in support of the order for temporary inpatient mental health services. See Tex.
Health & Safety Code Ann. § 574.034(d). The evidence is legally sufficient to support the trial
court's order. See In re J.F.C., 96 S.W.3d at 266.

 In addressing C.W.'s factual sufficiency complaint, we consider the evidence the factfinder
could reasonably have found to be clear and convincing. In re C.H., 89 S.W.3d at 25. C.W. denied
having the intent to hurt himself or anyone else. However, he had been hospitalized and taking
medication for almost two weeks, which tends to improve his condition. While he had been
voluntarily taking his medication, he maintained that he does not suffer from a mental illness and
does not need to take medication. There was some evidence that C.W. might get a job or obtain
donations as an income, but the doctor's testimony casts doubt on whether he could function in the
workplace or keep a job. In light of the entire record, we cannot say that the trial court could not
reasonably form a firm belief or conviction that C.W. is likely to cause harm to himself and others. 
See id. Thus, the evidence is factually sufficient to support the trial court's findings. Because we
hold the evidence is both legally and factually sufficient to support the trial court's order, we
overrule C.W.'s first issue.


Constitutional Claims

 In his second and third issues, C.W. contends the trial court erred in rendering judgment in
violation of state and federal guarantees of due process. He asserts that certain terms found in
section 574.034 of the Health and Safety Code are overly broad, vague, and ambiguous so the statute
is susceptible to a variety of interpretations, making it violative of the due process clause of each
constitution. In his fourth and fifth issues, he asserts that application of section 574.034 results in
a violation of his right to equal protection under both the state and federal constitutions.

 C.W. did not complain to the trial court that his state and federal constitutional rights to due
process and equal protection were being violated. A constitutional claim must have been asserted
in the trial court to be raised on appeal. Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex. 1993). 
Therefore, C.W. has not preserved these complaints for review. We overrule C.W.'s issues two,
three, four, and five.


Ineffective Assistance of Counsel

 In his sixth issue, C.W. contends he was denied effective assistance of counsel because trial
counsel failed to object to the constitutionality of the applicable statutes. He argues that this resulted
in his being subjected to unconstitutional statutes at trial and the loss of relief due to waiver on
appeal. 

 The United States Supreme Court has established a two-part test, also adopted by Texas
courts, to determine whether the representation of counsel was effective. The defendant must show
that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is
a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings
would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064,
80 L. Ed. 2d 674 (1984). Counsel is presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional judgment. Strickland, 466 U.S. at
689, 104 S. Ct. at 2065. The appellant has the burden of proving ineffective assistance of counsel
claims by a preponderance of the evidence. Jackson v. State, 973 S.W.2d 954, 956 (Tex. Crim.
App. 1998). Claims of ineffective assistance of counsel must be supported by the record. See
Mercado v. State, 615 S.W.2d 225, 228 (Tex. Crim. App. [Panel Op.] 1981). When the record
contains no evidence of the reasoning behind counsel's conduct, we cannot conclude counsel's
performance was deficient. Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

 The record is silent as to counsel's trial strategy. We have no evidence from counsel's
perspective concerning whether he considered challenging the constitutionality of section 574.034
and, if so, the reasons he decided not to. Therefore, we are unable to determine that the failure to
raise those issues in the trial court constitutes ineffective assistance of counsel. Jackson, 877
S.W.2d at 771. C.W. has failed to show that his counsel's performance fell below the objective
standard of reasonableness. Further, even if we agreed that trial counsel's performance was
deficient, C.W. has failed to make any showing that he was prejudiced as a result. C.W. alludes to
the fact that, had counsel made the objections, the trial court might have agreed with him. However,
he presents no authority from which we can determine that counsel's constitutional challenges, if
raised, would have been sustained by the trial court. C.W. has failed to show that there is a
reasonable probability that the result of the proceeding would have been different but for the alleged
error made by counsel. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. C.W. has failed to meet his
burden of proving ineffective assistance of counsel. Jackson, 973 S.W.2d at 956. Accordingly, we
overrule C.W.'s sixth issue.


Conclusion

 The evidence is legally and factually sufficient to support the trial court's order of
commitment for temporary inpatient mental health services. C.W.'s constitutional complaints have
not been preserved and his trial counsel was not ineffective.

 We affirm the trial court's order of commitment for temporary inpatient mental health
services.

 JAMES T. WORTHEN 

 Chief Justice


Opinion delivered October 8, 2003.

Panel consisted of Worthen, C.J., Griffith, J. and DeVasto, J.


(PUBLISH)